**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYL JOHNSON a/k/a Sylvester Thompson, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15-cv-03928 |
| ) | |
| ERIC BARRIER, p/k/a ERIC B., WILLIAM ) | |
| GRIFFIN, p/k/a RAKIM, ERIC B. MUSIC INC., ) | |
| f/k/a ERIC B. AND RAKIM MUSIC, INC., a ) | |
| New York corporation, UMG RECORDINGS, ) | |
| INC., a Delaware corporation as successor in ) | |
| Interest to MCA Records, Inc. and Universal ) | |
| Records, Inc., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On June 28, 2016, the Court dismissed Plaintiff Syl Johnson ("Johnson")'s Second Amended Complaint against Defendant UMG Recordings, Inc. ("UMG"), granting leave to re-plead following limited jurisdictional discovery (the "June Opinion"). (R.99; R.102; R.119). On October 27, 2016, Plaintiff filed a Third Amended Complaint. (R.120). Before the Court is UMG's motion to dismiss the Third Amended Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). (R.123). UMG has also renewed its motion to dismiss pursuant to Rules 12(b)(6) and 12(c). (*Id.*). For the reasons set forth below, the Court grants UMG's Rule 12(b)(2) motion and dismisses the Third Amended Complaint without prejudice to refile where the court has personal jurisdiction. Given this disposition, the Court does not reach UMG's renewed arguments in favor of Rule 12(b)(6) or 12(c) dismissal.

**BACKGROUND**[1]

Plaintiff Johnson is a Chicago-based rhythm and blues musician. He is the vocalist, guitarist, and band leader of the sound recording, "I Feel an Urge." (R.120, Third Am. Compl. ¶ 5). This case concerns the alleged misappropriation of a 3.094 second slice of that recording (the "Johnson Sample") into products titled variously as "Know the Ledge," "Juice" and "Juice (Know the Ledge)." (*Id.* ¶ 1). Johnson alleges 358 unlawful uses since 1991, ranging from theater and television movies to DVDs, greatest hits compilations, music videos, video games, and commercials (the "Juice Products"). (*Id.* ¶¶ 1, 65; R.120-4). He now brings claims for misappropriation (Count I) and injunctive relief (Count II) against Defendant UMG.

In the June Opinion, the Court declined to exercise jurisdiction over UMG. (R.99, June Opinion). In relevant part, the Court concluded that Johnson had failed to demonstrate either (i) that UMG's contacts were "so substantial as to render [it] 'essentially at home' in Illinois" under a general jurisdiction theory, or (ii) that "UMG's suit-related conduct created a 'substantial connection' with Illinois" under a specific jurisdiction theory. (*Id.* at 6, 10). The Court exercised its discretion to permit targeted jurisdictional discovery, granting Johnson the opportunity to serve interrogatories and to examine a Rule 30(b)(6) witness concerning the sale of Juice Products by UMG and/or any distribution affiliate within Illinois, as well as concerning any Illinois-focused marketing or targeting activity of UMG as related to Juice Products. (*Id.* at 10-11). The Court granted Johnson leave to re-plead following the completion of jurisdictional discovery. (*Id.*).

According to Johnson's Third Amended Complaint: "UMG is amenable to suit in an Illinois court under Illinois' Long-Arm Statute, 735 ILCS 5/2-209(a)(2), by the commission of

---

[1] The Court assumes familiarity with the factual background of this action as set forth in the June Opinion, and does not recite it here.

intentional torts in Illinois; and in that UMG established minimum due process contacts with Illinois, 735 ILCS 5/2-209(c), through its 1991 through 2016 sales of Juice Products in Illinois… together with UMG's shipments of Juice Products to Illinois and by negotiated arrangements with distributors and retailers located in Illinois to distribute and/or sell its products in Illinois such that UMG should reasonably anticipate being haled into court in Illinois regarding injury inflicted by virtue of its Illinois sales[.]" (R.120, Third Am. Compl. ¶ 10). In support of these allegations, Johnson's pleading attaches a UMG spreadsheet—obtained during the course of jurisdictional discovery—showing four categories of information for various Juice Products throughout 2000 – 2016: (1) Product Shipments in Illinois; (2) Product Shipments to the Rest of the U.S.; (3) Total Product Shipments to U.S., including Percentage to Illinois, by Quantity; and (4) Total Product Shipments to U.S., including Percentage to Illinois, by Revenue. (R.120-1, Ex. A to the Third Am. Compl.). UMG derived this information from "invoices regarding shipments of physical 'Juice' products to Illinois addresses, which do not reflect the location of ultimate retail sales." (R.105-1, UMG Interrogatory Responses at 5; *see also* R.120-2, Cho Dep. Tr. at 56 (testifying that the spreadsheet reflects UMG's "wholesale shipments but not necessarily where the sales were actually made")). As both parties acknowledge, this spreadsheet demonstrates that:

> UMG's revenues from wholesale shipments of Juice products to Illinois between 2000 and 2016 were only $47,000, but its revenues from nationwide shipments for the same time period were *over $4 million*. Thus, the Illinois revenue represents just *one percent* (1%) of nationwide revenue for the same time period. Over that time period, a mere 6,194 units of Juice products were shipped to Illinois, compared with 534,986 units shipped nationwide. Again, the Illinois units represent only *one percent* (1%) of nationwide units shipped.

3

(R.123, Opening Br. at 3-4; R.120, Third Am. Compl. ¶ 24 (estimating "Total Illinois Sales" since 1991)).[2] As UMG's corporate designee testified, UMG does not make retail sales to consumers. Instead, it ships physical product either (i) to retailers, or (ii) to distribution companies, such as its affiliate UMG Commercial Services, Inc. ("UMGCS"), as well as non-affiliated distributors. (R.120-2, Cho Dep. Tr. at 42, 49, 64, 68-70, 81-82). In addition, UMG has no record of "Illinois-specific marketing" associated with the Juice Products. (*Id.* at 94).

## LEGAL STANDARD

A motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2); *Central States v. Phencorp. Reins. Co.*, 440 F.3d 870, 875 (7th Cir. 2006). In analyzing a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Where, as here, the Court previously allowed jurisdictional discovery, and neither party requested an evidentiary hearing, the burden falls on Johnson to prove the existence of personal jurisdiction by a preponderance of the evidence. *See Linkepic Inc v. Vyasil, LLC*, 146 F. Supp. 3d 943, 948 (N.D. Ill. 2015).

## ANALYSIS

### I.     Applicable Legal Principles

In this diversity action, personal jurisdiction is governed by the law of the forum state. *See N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014); *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). A "court's exercise of jurisdiction over the defendant must be authorized by the terms of the forum state's long arm statute and also must comport with the requirements of the Fourteenth Amendment's Due Process Clause." *Felland*, 682 F.3d at 672

---

[2] UMG does not have wholesale revenue information prior to the year 2000. (R.117 at 6). In addition, it does not have similar information regarding digital (as opposed to physical) products. (R.105-1 at 5).

(citing *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)); *see also N. Grain Mktg.*, 743 F.3d at 491-92.

In the Third Amended Complaint, Johnson invokes two provisions of the Illinois long-arm statute – specifically, 735 ILCS 5/2-209(a)(2) and 735 ILCS 5/2-209(c). (R.120, Third Am. Compl. ¶¶ 10, 15-19, 20-24). The first provision permits Illinois courts to exercise jurisdiction over a person "as to any cause of action arising from . . . [t]he commission of a tortious act within [the] State." *See* 735 ILCS 5/2-209(a)(2). In other words, Illinois courts "may exercise personal jurisdiction over defendants in tort suits if the defendant performs an act or omission that causes an injury in Illinois and the plaintiff alleges the act was tortious in nature." *See Philos Techs., Inc. v. Philos & D, Inc.*, 802 F.3d 905, 915 (7th Cir. 2015) (citation and quotation omitted). "This analysis, however, accounts for only the *statutory* authorization to exercise personal jurisdiction; any such exercise still must comport with federal due-process principles." *Id.* at 915-16 (emphasis in original). The second provision, meanwhile, permits a court to exercise personal jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *See* 735 ILCS 5/2-209(c). Because the Seventh Circuit has recognized that "there is no operative difference between these two constitutional limits," the key question is "whether the exercise of personal jurisdiction would violate federal due process." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) (citations omitted). Federal due process, in turn, requires the defendant to have had "certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See Advanced Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800-01 (7th Cir. 2014) (citation and quotation omitted).

Personal jurisdiction may be either general or specific. *See id.* (citing *Daimler v. Bauman*, 134 S. Ct. 746, 753 (2014)). A court may assert general jurisdiction over a foreign corporation "to hear any and all claims against it" only "when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render it essentially at home in the forum State." *Daimler*, 134 S. Ct. at 751 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)). Specific jurisdiction, on the other hand, "is available for a suit that arises out of the forum-related activity." *Advanced Tactical*, 751 F.3d at 800. Three requirements exist to establish specific jurisdiction: "(1) the defendant must have purposely availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (citations omitted).

## II. The Third Amended Complaint Fails to Establish Specific Jurisdiction over UMG

Here, Johnson does not contend that the Court has general jurisdiction over UMG. (R.126, Response Br. at 9). Instead, Johnson argues that specific jurisdiction exists over UMG. Courts evaluate specific jurisdiction "by reference to the particular conduct underlying the claims made in the lawsuit." *See Tamburo*, 601 F.3d at 702; *see also Felland*, 682 F.3d at 674 ("We note at the outset that the nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue"). In this case, Johnson alleges that UMG—through its songwriter artists—"knowingly and intentionally transferred" the Johnson Sample into various "Juice" formats, after which UMG sold the Juice Products without (i) incurring the normal production costs, (ii) crediting Johnson, or (iii) paying Johnson a licensing fee. (R.120,

6

Third Am. Compl. ¶¶ 63-69). According to Johnson, UMG has sold and shipped "Juice Products with mislabeled and misappropriated content . . . in Illinois and in other States." (*Id.* ¶ 1).

A.  The "Express Aiming" Test

Because this case involves the intentional tort of misappropriation, UMG urges the Court to examine personal jurisdiction by reference to the "express aiming" test set forth in *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, Florida residents who published an allegedly libelous story about a California resident—using California sources—and who knew the subject would suffer "the brunt of the harm" in California, were subject to personal jurisdiction in California despite lacking other contacts with the State. *See id.* at 787-90. In so holding, the Supreme Court recognized that a party's intentional conduct in one state, "calculated to cause injury to" a resident of a different state, subjects the former to jurisdiction in the latter state. *See id.* at 791. As the Seventh Circuit has interpreted it, *Calder* requires a showing of (1) intentional conduct, (2) expressly aimed at the forum state, (3) "with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *See Tamburo*, 601 F.3d at 703. In other words, "[t]ortious acts aimed at a target in the forum state and undertaken for the express purpose of causing injury there are sufficient to satisfy *Calder*'s express-aiming requirement." *Id.* at 707.

Here, UMG argues that Johnson has shown neither an intent to cause injury nor a "targeting" of Illinois with respect to the alleged misappropriation. Regarding the general "intent" element, the Court disagrees with UMG's assessment insofar as Johnson has alleged intentional misappropriation, claiming that UMG (and its "agents") copied the Johnson Sample, knowingly used it in Juice, and permitted its distribution without proper licensing. (R 120, Third Am. Compl. ¶¶ 42, 46, 52-53, 63-64). UMG, meanwhile, has not "denie[d] this allegation with

affidavit evidence[,]" unlike the defendants in its cited authorities. *See Novelty, Inc. v. RCB Distrib., Inc.*, No. 1:08-CV-0418-DFH-WTL, 2008 WL 2705532, at *3 (S.D. Ind. July 9, 2008); *see also Richter v. INSTAR Enterprises Int'l, Inc.,* 594 F. Supp. 2d 1000, 1011-12 (N.D. Ill. 2009). UMG, for example, has not denied knowing that it owed credit and compensation to Johnson in connection with the Juice Products. (R.120, Third Am. Compl. ¶ 53).[3] The Court agrees, however, that Johnson has not demonstrated that UMG "targeted" Illinois in its allegedly tortious conduct. The Third Amended Complaint, for example, makes no allegation that UMG knew of Johnson's residence within Illinois. (*Contra* R.120, Third Am. Compl. ¶ 19 ("The injury occurred in Illinois . . . when UMG made sales in Illinois and failed to pay Johnson his licensing fee in Illinois")). Moreover, UMG's wholesale shipments and sales of Juice Products within Illinois constituted only 1% of its total wholesale figures, and—as UMG's corporate designee testified—none of the marketing associated with the Juice Products was specific to or otherwise targeted Illinois. (R.123, Opening Br. at 7-9 (citing R.120-2, Cho Dep. Tr. at 90-94)). Johnson does not contest this testimony or introduce any other evidence of "express aiming," apart from his own residence. The fact that Johnson suffered an "injury" in Illinois, however, does not bear on whether UMG's "conduct connects [it] to the forum in a meaningful way." *See Walden*, 134 S. Ct. at 1125 ("*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum").

Johnson, in fact, does not discuss the *Calder* test in any detail. Instead, he relies on a "purposeful availment" theory – specifically, that UMG purposefully availed itself to Illinois markets through "25 years of shipments of Juice Products to Illinois and sales of Juice Products in Illinois." (R.126, Response Br. at 4, 8). Although the Seventh Circuit has suggested that

---

[3] The Cho Affidavit, submitted by UMG, does not refute any specific allegation of the Third Amended Complaint. (R.123-1).

8

"*Calder* speaks directly to personal jurisdiction in intentional-tort cases," *see Tamburo*, 601 F.3d at 703 n.7, it has elsewhere observed that *Calder* is "merely one means of satisfying the traditional due process standard set out in *International Shoe* and its familiar progeny[.]" *See Mobile Anesthesiologists*, 623 F.3d at 445; *see also uBID, Inc. v. GoDaddy Grp., Inc.,* 623 F.3d 421, 426 (7th Cir. 2010) ("the Supreme Court has found that the contacts supporting specific jurisdiction can take many different forms"). Even absent a demonstration of "express aiming," for example, "[a] defendant's deliberate and continuous exploitation of the market in a forum state, accomplished through its website as well as through other contacts with the state, can be sufficient to establish specific personal jurisdiction." *Mobile Anesthesiologists*, 623 F.3d at 446. The Court, accordingly, turns to Johnson's "purposeful availment" theory. *See uBID*, 623 F.3d at 427 n.1 ("Because GoDaddy's actual contacts with Illinois meet the constitutional standard for minimum contacts . . . we need not decide whether sufficient contacts should be imputed under the *Calder* 'express aiming' test"); *see also Telemedicine Sols. LLC v. WoundRight Techs., LLC*, 27 F. Supp. 3d 883, 891 (N.D. Ill. 2014) ("to the extent that the 'express aiming' test applies to this mixed-claims case, it is part of the broader minimum contacts query"); *Richter*, 594 F. Supp. 2d at 1012-18 (analyzing contacts beyond the *Calder* test).

        **B.**        **UMG's "Purposeful Availment" to Illinois Markets**

Although unclear, Johnson's "purposeful availment" theory appears to derive from the Supreme Court's decision in *Keeton v. Hustler Magazine.* This theory concerns whether UMG has "continuously and deliberately exploited" the Illinois market through its wholesale distribution of Juice Products, such that "it must reasonably anticipate being haled into court there" in this misappropriation action. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984); *see also uBID*, 623 F.3d at 427 ("GoDaddy has thoroughly, deliberately, and

9

successfully exploited the Illinois market"); *but see be2 LLC v. Ivanov*, 642 F.3d 555, 559 (7th Cir. 2011) ("There is no evidence that defendant Ivanov targeted or exploited the market in the state that would allow a conclusion that he availed himself of the privilege of doing business in the state").

Here, since 2000, UMG has shipped 6,194 units of Juice Products on a wholesale basis to distributors or retailers with Illinois mailing addresses. By Johnson's estimation—which UMG does not dispute—UMG has made at least $75,000 in wholesale revenue from its Illinois shipments since 1991. (R.120, Third Am. Compl. ¶ 24). According to Johnson, "[b]y these sales and shipments, UMG has purposefully availed itself of Illinois' system of laws, infrastructure, and business climate." (R.120, Third Am. Compl. ¶¶ 10, 22-23). While the Court recognizes that "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact[,]" *Walden*, 134 S. Ct. at 1122, it is not convinced that such product shipment alone satisfies the constitutional standard for minimum contacts, particularly in this intentional tort case. *See id.* at 1123 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum"); *Felland*, 682 F.3d at 674 ("Where a plaintiff's claim is for an intentional tort, the inquiry focuses on whether the conduct underlying the claim was purposely directed at the forum state") (citation omitted).

Johnson has offered no details, for example, concerning UMG's wholesale business – specifically, whether it intended or expected the further distribution or re-sale of Juice Products within Illinois, such that it should have reasonably anticipated being haled into court there. *See Calder*, 465 U.S. at 789 (distinguishing "untargeted negligence" from "express aiming"); *see also Philo*, 802 F.3d at 913 ("The defendant must have deliberately established these contacts").

As the Cho Affidavit clarifies, even with respect to its affiliated distributor, UMG has no control over its "day-to-day activities, including whether and the extent to which [UMGCS] may conduct business in a particular jurisdiction." (R.123-1, Cho Aff. ¶ 11). The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *See Walden*, 134 S. Ct. at 1122. Here, Johnson has failed to explain the market interaction between UMG, the third-party distributors and/or retailers, and the State of Illinois (including its consumer-residents) with respect to the ultimate sale of Juice Products within Illinois. *See be2 LLC*, 642 F.3d at 558 (federal due process requires that a defendant "not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or of the unilateral activity of another party or a third person").[4] Broad allegations concerning UMG's "authorization" of third-party distribution activities "throughout the United States, including in Illinois" (R.120, Third Am. Compl. ¶¶ 10, 21) do not convince the Court that jurisdiction is proper here.

Moreover, even assuming that UMG expects its wholesale products to remain within Illinois, Johnson has failed to liken its wholesale activity to the "market exploitation" at issue in *Keeton* or *uBID*. In *Keeton*, for example, the Supreme Court held that Hustler Magazine's "regular monthly sales of thousands of magazines" in New Hampshire sufficed "to support jurisdiction when the cause of action [libel] arises out of the very activity being conducted." *See* 465 U.S. at 774, 779-80. It further reasoned that, because Hustler "produce[d] a national publication aimed at a nationwide audience[,]" there was "no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Id.* at 781. In *uBID*, meanwhile, defendant GoDaddy had conducted a

---

[4] Similarly, given Johnson's failure to explain UMG's litigation-specific connection to Illinois consumers, he cannot avail himself of the stream-of-commerce theory of specific jurisdiction. *See Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550-51 (7th Cir. 2004).

11

"nationwide advertising campaign" resulting in "Illinois customers in the hundreds of thousands," who, in turn, "delivered many millions of dollars in revenue to GoDaddy[.]" *See* 623 F.3d at 424. As the Seventh Circuit observed:

> This is a company that, like the national magazine in *Keeton,* has conducted extensive national advertising and made significant national sales. GoDaddy has aired many television advertisements on national networks, including six straight years of Super Bowl ads. It has engaged in extensive venue advertising and celebrity and sports sponsorships. All of this marketing has successfully reached Illinois consumers, who have flocked to GoDaddy by the hundreds of thousands and have sent many millions of dollars to the company each year. These contacts establish GoDaddy's minimum contacts with the state for claims sufficiently related to those contacts.
>
> As *Keeton v. Hustler* shows, a typical business that operates on a national scale with GoDaddy's sales in Illinois, GoDaddy's customer base in Illinois, and GoDaddy's blanket of advertising in Illinois would unquestionably be subject to personal jurisdiction there for claims arising from its business activities that reach into the state. It would be reasonable for such a company to expect to be sued there.

*Id.* at 427, 429.

Here, although Johnson now asks the Court to take judicial notice of the fact that "UMG is a major label in the United States and internationally" (R.126, Response Br. at 5), he has failed to offer sufficient evidence that UMG's litigation-specific conduct was "aimed at a nationwide audience," or "operate[d] on a national scale," so as to invoke a *Keeton* theory of jurisdiction. *See Keeton*, 465 U.S. at 781; *uBID*, 623 F.3d at 429. Taken together, the allegation that UMG shipped Juice Products on a wholesale basis to third parties in "Illinois and in other States" (R.120, Third Am. Compl. ¶ 1), and the UMG spreadsheet entry reflecting "Product Shipments to the Rest of the U.S." (R.120-1), do not convince the Court that this case constitutes the "rare" occasion in which "the very broad conception of jurisdiction envisioned in *Keeton* likely applies[.]" *See Tamburo*, 601 F.3d at 707 n.10; *contra Basile v. Prometheus Glob. Media, LLC*, No. 15-CV-10138, 2016 WL 2987004, at *3-4 (N.D. Ill. May 24, 2016) (exercising *Keeton* jurisdiction in light of "Prometheus's own media kit boast[ing] to its existing and would-be

advertisers that *The Hollywood Reporter* is distributed to industry moguls 'in metropolitan areas from coast to coast'"). Moreover, UMG's varied history of product shipment (namely, 6,194 units over a 16-year period) to Illinois-based distributors or retailers is a far cry from the "extensive" contacts presented in *uBID*, or the "regular" and "substantial" activity at issue in *Keeton*. *See uBID*, 623 F.3d at 432-33; *Keeton*, 465 U.S. at 774, 781; *contra Scherr v. Abrahams*, No. 97 C 5453, 1998 WL 299678, at *4 (N.D. Ill. May 29, 1998) ("Fewer than 60 copies of the AIR enter Illinois by subscription every other month . . . This is insubstantial when compared to the 10,000 to 15,000 monthly copies in *Keeton*") (citing *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1029 (2d Cir. 1997) ("We doubt that four copies per day . . . constitute the 'substantial number of copies' that makes it fair to exercise jurisdiction over a non-resident publisher")). Perhaps most significantly, as discussed above, Johnson has failed to explain how UMG's wholesale shipments, alone, amount to UMG "purposefully reach[ing] out beyond [one] State and into another[.]" *See Walden*, 134 S. Ct. at 1122 (discussing *Keeton*).

Given Johnson's failure to address authorities such as *Keeton* or *uBID*, and on the basis of the jurisdictional record before it, the Court declines to find that UMG "availed [itself] of the privilege of doing business in the state" by shipping 6,194 wholesale units of Juice Products to third-party distributors and/or retailers with Illinois mailing addresses over the course of 16 years. *See be2 LLC*, 642 F.3d at 558-59. In other words, absent (i) additional contacts with Illinois, and/or (ii) more evidence bearing on UMG's deliberateness, the Court is not convinced that UMG's suit-related conduct created a "substantial connection" with Illinois. *See Advanced Tactical*, 751 F.3d at 801-02 ("it is unlikely that those few sales alone, without some evidence linking them to the allegedly tortious activity, would make jurisdiction proper") (citing *Calder*); *contra Russell v. SNFA*, 2013 IL 113909, 987 N.E.2d 778, 782-83, 796-97 (Ill. 2013) (evaluating

13

evidence of defendant's ongoing business relationship with an Illinois entity, including product sales and on-site meetings, and observing, "[b]y engaging a business entity located in Illinois, defendant undoubtedly benefitted from Illinois' system of laws, infrastructure, and business climate"). Although Johnson integrates this language from *Russell* in the Third Amended Complaint, (R.120, Third Am. Compl. ¶22), he identifies no additional contact of UMG relevant to the Court's jurisdictional analysis, unlike the *Russell* plaintiff. *See id.* To the contrary, a jurisdictional finding on the basis of Johnson's limited showing "would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item. The creation of such *de facto* universal jurisdiction runs counter to the approach the [Supreme] Court has followed since *International Shoe*, and that it reaffirmed as recently as February 2014 in *Walden*." *See Advanced Tactical*, 751 F.3d at 801-02. The Court declines to render such a jurisdictional finding.

### C. Johnson's Lack of Legal Authority

Despite bearing the burden of demonstrating the existence of personal jurisdiction, *see Purdue Research*, 338 F.3d at 782, Johnson has not clearly explained his theory of jurisdiction or analogized the facts of this case to any other case. Accordingly, and for the reasons explained above, the Court finds that Johnson has not satisfied the "constitutional touchstone" of the due process inquiry – that is, a demonstration that UMG "purposefully established minimum contacts" in Illinois. *See Jennings*, 383 F.3d at 551. Given this failure, the Court does not reach the application of the Illinois long-arm statute. *See Philos*, 802 F.3d at 915-16 (holding that the exercise of jurisdiction pursuant to 735 ILCS 5/2-209(a)(2) "still must comport with federal due-process principles"); *Purdue*, 338 F.3d at779-80 (declining to address whether state law

subjected a defendant to in personam jurisdiction, where the exercise of jurisdiction violated federal due process in the first instance).

## CONCLUSION

For the foregoing reasons, the Court grants Defendant UMG's Rule 12(b)(2) motion and dismisses the Third Amended Complaint without prejudice to refile where the court has personal jurisdiction. The Court hereby closes this case and strikes all pending deadlines.

**Dated:** January 4, 2017

_____
AMY J. ST. EVE
United States District Court Judge